BROOKE (WOOD M. & R. CO. v.). See Case No. 17,980.

BROOKFIELD (YEARSLEY. v.). See Case No. 18,131.

## Case No. 1,937.

### The BROOKLINE.

[1 Spr. 104;[1] 8 Law Rep. 70.]

District Court, D. Massachusetts. April Term, 1845.

SEAMEN—SERVICES REQUIRED—WAGES—EXTRA COMPENSATION.

1. Where a crew were shipped on a voyage, "to a port or ports easterly of the Cape of Good Hope, or any other port or ports to which the master should see fit to go, in order to procure a cargo," but the voyage intended by the owners was a voyage to Ichaboe to procure a cargo of guano, which destination was concealed from the seamen, it was held, that the seamen were not bound to work in loading the

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

guano, at the compensation fixed by the shipping-articles.

[Cited in Somerville v. The Francisco, Case No. 13,171.]

2. The master having agreed to pay the seamen an extra compensation, to induce them to load the guano, it was held, that the master and owners were bound by that agreement.

3. The seamen were not limited, in their claim for compensation, by the amount agreed upon at the island,—they having been brought there by deception, and placed at disadvantage for making a contract.

[4. Cited in The Charles F. Perry, Case No. 2,616, to the point that, where the principal contract was maritime, the jurisdiction of the admiralty would not be defeated by the fact that some incidental services were performed on land.]

[Cited in The Artisan, Case No. 568.]

At law. This was a case in which a number of seamen [James Smith and 13 others] claimed additional compensation, beyond that stipulated in the articles. It appeared that it was the primary intention of the owners that the vessel should go to the island of Ichaboe, to procure a cargo of guano. In order to prevent competition, the destination of the voyage was kept secret, and it was only communicated to the captain and the first and second mates. The shipping-master did not know the object of the voyage, which was described in the shipping-articles, as a voyage from the port of Boston to a port or ports easterly of the Cape of Good Hope, or any port or ports to which the master should see fit to go, in order to procure a cargo, and back to a port in the United States. The crew were shipped under these articles, and the vessel sailed to the island of Ichaboe. On their arrival, the captain ordered the seamen to assist in loading the English ship Euclid. The guano manure, on that island, was usually dug in pits, about ten feet wide, dug through from one side of the island to the other. When a ship had obtained a position at one of these places, and the consequent facilities for loading, it was usual for the second comer to aid in loading her, for the consideration of securing the place, in her turn, when the first vessel should be loaded. The men of the Brookline objected to do the work, on the ground that they shipped for a voyage to the East Indies. There was an entry made on the log-book of their refusal, and the reason that they gave; and no suggestion that it was untrue. About one half of the crew were green hands. The captain called the green hands together, and directed them to go to work. They objected. He insisted that they were bound to do it, and threatened them with coercion, if they did not obey. They did not yield, however, but still refused. He then sent for all hands, and endeavored to compel them to work; but finding that they would not, he finally offered them three pence a ton for all the guano which they should load, in addition to their wages. After consultation, they agreed to his terms, went to work, loaded the Euclid,

and subsequently their own vessel. There were twenty men from the Brookline at work, while the Euclid had only four. The Brookline had afterwards the assistance of the Shakespeare, for a short time, in loading; but the latter vessel left them, on finding that the pit would not hold out to supply another cargo. The seamen of the Brookline were at work at the island about thirteen weeks. It was evidence, that the services were unusually dangerous and disagreeable. The seamen now brought this suit to recover the additional compensation agreed upon at the island, and also such further compensation as should be decreed, on account of the perilous and unhealthy nature of the service, and the deceit which had been practised upon them, in relation to the destination of the voyage. It appeared that the wages stipulated by the shipping-articles had been paid. [Decree for libellants.]

E. D. Sohier & George A. Smith, for libellants.

F. C. Loring, for respondents.

SPRAGUE, District Judge, said that the first question was, whether the men were deceived. He thought the shipping-master was justified in understanding that a voyage to the East Indies was intended, and there was no doubt he so represented to the seamen. The only ports designated in the articles were a port or ports easterly of the Cape of Good Hope, and back to the United States. The additional mention of such port or ports as the captain should think fit to proceed to, if not void for uncertainty, must be considered as subordinate to the expressed intent of the articles. The court thought the seamen might well understand that a voyage to the East Indies was intended, and that they were deceived as to the voyage. The counsel had ingeniously argued that there was a distinction, between their being not informed of the object of the voyage, and their being deceived in relation to it. But some voyage was necessarily put forth by the articles. There was not merely a concealment, but there was a suggestio falsi as to the voyage they were going. The owners might have provided for the contingency of not finding a cargo, at a destined port in the East Indies. But here, the primary voyage intended was a voyage to the island of Ichaboe, to procure a cargo of guano. It was also argued that the seamen might have inferred, from the unusual circumstances of the case, that the voyage to Ichaboe was intended. Twenty men were employed, when ten hands would have been sufficient to navigate the vessel to the East Indies. But there was nothing to show to what particular port of the East Indies they expected to go; and the unusual number of men was but a slender ground, from which to draw an inference that they were going to Icha-

boe. It was also argued, that there was something unusual in the shipping-articles, which was calculated to put the seamen on inquiry. But if this was intended, the shortest and most direct way would have been, to have informed them where they were going. The fact was, it was intended that they should not know where they were going. The court were entirely satisfied that there was an intentional deception practised on the seamen. The object was not to get them at a lower rate of wages, but to prevent competition from other vessels. The rights of the seamen, however, were the same as if the deception had been for the purpose of inducing them to ship at a lower price; although it was, perhaps, less immoral in the owners.

The court had no doubt that the seamen were entitled to the additional compensation agreed upon at the island of Ichaboe. It was objected that the captain agreed to that contract under duress, he having no other men there; and they being bound to do the work without any such extra compensation. The court were of opinion that they were not bound to do the work, because fraud had been practised upon them to get them there. The seamen were in some measure placed in duress, being threatened by the captain with the consequences of mutiny, if they did not go to work. The master and owners were clearly bound to pay the amount stipulated at the island.

But the seamen claimed a further compensation; and the question was, whether they were limited to the sum of three pence per ton, by their express contract. They were cheated into a voyage on which they never intended to go. The services were unusually dangerous. The place where the vessels were obliged to anchor was an open roadstead [there being no harbor],[2] exposed to the winds and waves of the ocean, the vessels were frequently dashed against each other and against the rocks,—and the witnesses had testified that they had seen men killed thereby. The work on the guano itself was somewhat dangerous to health, and the odor was noxious and offensive. There was also danger of the caving in of the pits, the walls of which were in some places forty feet high and only ten feet wide; and men from other vessels had been buried by the falling in of the manure. The effluvia and dust were extremely annoying. There were at least two men sick, on an average, during the whole time of loading. The court were clearly of opinion that the seamen were not limited by their express contract. They had been cheated into the voyage, and engaged in services dangerous, nauseous and unhealthy. The captain, on arriving at the island, instead of frankly stating that he had been compelled to conceal from them the destination of the voy-

---

[2] [From 8 Law Rep. 70.]

age, and offering them fair and ·reasonable terms, undertook to practise at first upon the green hands, by taking them, in the absence of all advisers, and of the older seamen, who would be more likely to understand their rights, telling them falsely that they were bound to go to work. and threatening them with the consequences of disobedience. The perils or suffering the punishment provided by the maritime law, in cases of mutiny, hung over their heads. They were placed at a great disadvantage in. making a contract. He used the same threats to the other seamen. They did not agree to work unconditionally, but in accepting his terms, they acted under the influence of his threats. They were wrongfully put to disadvantage by the captain, and the terms were offered, without retracting his threats. [They were in danger of coercion, and perhaps of being put in irons.][3] They could not leave the ship, for they were at a barren, uninhabited island; and an attempt to take the ship by force, and come home in her, would be highly dangerous, and subject them to the charge of mutiny.

The only difficulty the court felt, was the want of a satisfactory guide as to the amount of compensation. It was said that satisfactory persons might have been hired, for the wages usual for seamen on other voyages. But it was not certain that those who could thus be hired, knew the nature of the work. A shipping-master stated, that he should not think of getting those who had been there once. But the rate at which others might be willing to go, was no measure of compensation for those who had been induced by deception to go a voyage, which they never intended. The seamen had a right to their option. [They had a right to be consulted, but they were not.][3] They were carried to Ichaboe, without any opportunity to judge for themselves. Mr. Bertrand, the only witness who testified definitely as to the proper rate of compensation, said it was worth $20 or $25 per month. It did not appear clearly, whether he meant so much for the whole voyage, or only for the time when they were at the island. [Feeling the want of a guide as to the proper amount.][3] The court thought that each man should receive $55 in addition to the wages stipulated by the shipping-articles. This sum would include the three pence per ton which was agreed upon at the island. [The mate had said that Antoine and Ransom knew where they were going when they shipped, and that two others of the crew also knew it. But it appeared that this was a mere inference which he drew from hearing them speak about guano, and the work of shovelling it, in some conversation which they had. The destination of the voyage was not talked of among the crew, until they had been out

a fortnight. Was this credible, if four of them had known it? The owners and officers, whose answers or testimony were in the case, had said that they never told them, the shipping-master himself did not know. How then did these men know? The mass of negative testimony was inconsistent with the inference of the mate. Perry stood on a different footing. He was sick on board, when at the island, and was exempted from the dangerous and disagreeable duty of shovelling, though he participated somewhat in the noxious effluvia. Decree for $12 to Perry, and $55 to each of the other libellants, and costs.][4]